# Exhibit 1

<u>Brighthaven Ventures L.L.C. / Lakota</u>
<u>**DRAFT NON-BINDING PROPOSAL**</u>

# Joint Venture Agreement
for Development and Commercialization of Remogliflozin-etabonate
Summary for Non-Binding Terms
August 14, 2010

This document is for discussion purposes only and does not constitute a binding agreement or letter of intent between the parties or an agreement to negotiate an agreement and there shall be no agreement between the parties unless and until there is a definitive agreement signed by both parties containing additional terms and conditions typically contained in license agreements concerning like subject matter. This document creates no obligation upon either party to enter into a transaction with the other party and neither party shall have any obligation arising out of this document. The terms set forth in this document are subject to all requisite corporate approvals, due diligence reviews, and appropriate tax and accounting considerations. This document and its terms are confidential, and neither party shall disclose the existence of this document or its terms without the prior written consent of the other party.

**General:** Brighthaven Ventures L.L.C. ("BHV") has a worldwide license from Kissei Pharmaceuticals for the development and commercialization of the novel SGLT2 inhibitor remogliflozin-etabonate ("remo"). Under the terms of a definitive agreement (the "Agreement"), BHV and Lakota ("Lakota") would collaborate to develop and commercialize products in the Field (defined below) in the Territory. Collectively BHV and Lakota shall be referred to as the "Parties."

**Joint Venture:** A new Limited Liability Company (the "LLC") will be created by the Parties. BHV will license certain rights to remo to the LLC. Lakota will contribute capital and project management to the LLC sufficient to fund the LLC liabilities and conduct the Development Plan through phase IIb. The equity ownership in the LLC shall be allocated 80% to Lakota and 20% to BHV. The JV will be managed by a Board with five Directors. Lakota may appoint one Lakota Director and one independent director. BHV may appoint one BHV Director and one independent director. One independent Director will be appointed by mutual consent of the Parties.

**License Grant:** To the LLC, BHV will grant an exclusive, sub-licensable, transferable license under the Kissei IP to research, develop, make, have made, manufacture, use, sell, offer for sale, promote, import or export Products in the Field and in the Territory. The general terms of the License Agreement to be agreed by the Parties will closely follow those from the BHV license agreement with Kissei dated December 10, 2010. The Term would commence as of the effective date of the License Agreement, and would continue in full force and effect until the expiration of the LLC's obligation to pay royalties; or until otherwise terminated.

**Initial Territory:** North America and Countries of the European Union.

**Secondary Territory:** Those countries outside of North America and the EU with the exception of Japan, Korea, Taiwan, China. License to the Secondary Territory will be granted

1

|  |  |
|---|---|
| | at the earlier of a) the LLC initiating phase III development, or b) the election of BHV to execute its change of control Tag-Along Rights or Lakota to execute its Drag-Along Rights. |
| **Field:** | Prevention, diagnosis and treatment of human metabolic diseases of Type 1 and Type 2 diabetes mellitus. |
| **Commercialization:** | LLC will be responsible for commercializing remo in the Territory |
| **Manufacturing:** | LLC will be responsible for manufacturing drug product to support Commercialization in the Territory. |
| **Joint Development Committee:** | The development program for remo in the Territory will be established in a written Development Plan, which would be managed by a Joint Development Committee (the "JDC"). The JDC would meet regularly, no less than quarterly. Final decisions related to the approval, modification, content control, steering and implementation of the development plan would be made by unanimous consent based on commercially reasonable judgment; provided, however, that any disputes would be raised to the JSC for final decision. So long as Dr. Wilkison and Mr. Green are members of the Lakota management team, the regular meetings of the JDC will be suspended and development decisions made by Lakota. |
| **Joint Steering Committee:** | The parties would form a Joint Steering Committee to oversee and coordinate the parties' activities under the Agreement with respect to the development and commercialization of Products in the Field in the Territory (the "JSC"). The JSC will be responsible for resolving disputes that may arise among the parties' respective representatives on committees formed under the Agreement (such as the JDC) and making certain strategic decisions regarding Products to be defined in the Agreement. Such committee would consist of equal numbers of members appointed by each party, and would operate by unanimous consent; provided that the LLC Board will have the casting vote on any disputed matters. The JSC will meet at least twice a year and each Party will update the other Party on the ongoing developments in its territories. So long as Dr. Wilkison and Mr. Green are members of the Lakota management team, the regular meetings of the JSC will be suspended and strategic decisions made by Lakota. |
| **BHV Liabilities:** | LLC will assume responsibility for a) obligations related to outstanding loans from the North Carolina Biotechnology Center, and b) payments due to Kissei as agreed under the License Agreement between BHV and Kissei. |
| **Supply Terms:** | BHV will supply LLC with API in sufficient quantity to support the Development Plan. BHV will be responsible for all expenses related to the transport, insurance, storage and maintenance of the remaining API provided however that the LLC will reimburse BHV for direct expenses related to such activities on a pass-through basis. The LLC will gain rights to the remaining API at the earlier of a) |

|  |  |
|---|---|
|  | the LLC initiating phase III development, or b) the election of BHV to execute its change of control Tag-Along Rights or Lakota to execute its Drag-Along Rights. |
| **Tag-Along:** | Each party will have pro-rata tag-along rights to participate in any sale of LLC equity. In addition, BHV will have the right to sell up to 100% of its stake in the LLC to any acquirer of a controlling interest of Lakota. |
| **Drag-Along:** | Lakota will have the right to require BHV participate in the sale of the LLC, up to 80% of its stake in the LLC to an acquirer of a controlling interest of Lakota. |
| **Upfront Payment:** | Lakota will issue 1,500,000 common shares to BHV. |
| **Contingent Payments:** | Lakota and BHV will split pro-rata any upfront and contingent compensation received from a license, sale, or other disposition of the remo program over and above the following milestones and royalties that are due Kissei: |

| Phase III start: | $10,000,000 |
|---|---|
| NDA Filing: | $15,000,000 |
| MAA Filing: | $ 7,500,000 |
| FDA Approval: | $25,000,000 |
| EMEA Approval: | $10,000,000 |
| Royalty: | 14% |

|  |  |
|---|---|
| **Diligence:** | The license will include a diligence clause where if remo is not actively being developed, rights granted in the license will revert back to BHV. Lakota agrees to initiate the process of clinical trial material manufacture and initiation of Development Plan within 60 calendar days of executing the Agreement. |
| **Employment Agreements:** | Dr. Wilkison and Mr. Green join Lakota with the titles/roles of Chief Operating Officer and Chief Business Officer, respectively. They will have employment agreements with Lakota that will include compensation, terms and conditions customary and commensurate with their role at the company as well as an upfront grant of 1,000,000 common shares of Lakota to be allocated evenly between Dr. Wilkison and Mr. Green in connection with their employment with Lakota. |
| **General Terms &** |  |

| | |
|---|---|
| **Conditions:** | The parties will negotiate in good faith additional customary and reasonable terms and conditions as part of the Agreement, including, without limitation, termination, improvements and grant-backs, change of control, payment reports and provisions related to warranties, confidentiality, limitation on liability, patent prosecution and enforcement and indemnification. |
| **Governing Law:** | TBD |
| **Confidentiality:** | This Term Sheet is subject to the confidentiality terms set forth in the CDA between parties. The existence and content of this summary of proposed terms, and the fact that negotiations may be ongoing between the parties, constitute "Confidential Information". |

4